## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

-----------------------------------------------------------------------x

**ALAN DERSHOWITZ,**                                              |          **Civil Action No.**

          **Plaintiff,**                                              |          _____

          -against -                                              |

**NETFLIX, INC., LEROY & MORTON**                          |
**PRODUCTIONS LLC, RADICALMEDIA LLC,**                     |
**LISA BRYANT and JOSEPH BERLINGER,**                      |

          **Defendants.**                                         |

-----------------------------------------------------------------------x

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Alan Dershowitz (hereinafter, "Professor Dershowitz"), by his attorneys NESENOFF & MILTENBERG LLP, BURSTYN LAW FIRM PLLC and JESSE DEAN-KLUGER, P.A., as and for his Complaint against Defendants Netflix, Inc., Leroy & Morton Productions LLC, Radical Media LLC, Lisa Bryant and Joseph Berlinger respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.     This is an action for defamation, breach of contract, promissory estoppel and fraudulent inducement brought by Professor Dershowitz, arising out of the four-part documentary series on Jeffrey Epstein entitled _Filthy Rich_, which first became available on May 27, 2020, to viewers on the streaming service known as "Netflix" ("Netflix Epstein series" or "_Filthy Rich_").

2.     Defendants knowingly and deliberately misled Professor Dershowitz as to their intentions for his participation in the series, and maliciously and intentionally portrayed Professor Dershowitz in a defamatory manner by (i) promoting and bolstering false allegations of sexual misconduct against Professor Dershowitz, and (ii) not presenting evidence in the Netflix Epstein

1

series that they received and agreed to present, which showed that alleged Epstein victim Virginia Giuffre, nee Roberts ("Giuffre") was "wrong, simply, wrong" (in the words of her own lawyer) to have accused Professor Dershowitz of sexual impropriety and that Professor Dershowitz did not have sex with her as she has falsely alleged. The portion of *Filthy Rich* concerning Giuffre's false allegations against Professor Dershowitz presented anew those allegations and was not a report of proceedings in any litigation.

## THE PARTIES

3.      Professor Dershowitz is a citizen and resident of the State of Florida. Professor Dershowitz is a distinguished Emeritus Professor of Law and constitutional scholar at the Harvard Law School and is now largely retired and domiciled in South Florida.

4.      Defendant Netflix, Inc. (hereinafter, "Netflix, Inc.") is an American technology and media services provider and production company that has its main headquarters in Los Gatos, California. Netflix, Inc. is incorporated under the laws of Delaware and is a citizen of Delaware. Netflix, Inc. is also a citizen of California because Netflix Inc.'s headquarters and principal place of business is located at 100 Winchester Circle, Los Gatos, California 90523. Netflix, Inc. is registered to do business in Florida as a foreign corporation, has offices in Florida and intentionally markets and advertises its services to Florida customers. As of February 2021, Netflix, Inc. has over 200 million paid subscriptions worldwide, including in the United States, and is available worldwide except in mainland China, Syria, North Korea, and Crimea. Netflix, Inc. has as the company's primary business a subscription-based streaming service which is commonly referred to as "Netflix" and which offers online streaming of a library of films, documentaries and television series, including those produced in-house or by a production company in contract with Netflix, Inc. As part of its services, Netflix, Inc. creates, develops and produces original content in collaboration with outside writers, directors and production companies.

5.     Defendant Leroy & Morton Productions LLC (hereinafter, "Leroy & Morton Productions") is a media and communications company that was founded by Jon Kamen, Frank Scherma and David Ellender, and produces films, television shows, documentaries and commercials. Leroy & Morton Productions is incorporated in Delaware, registered as a foreign corporation in New York, and is headquartered at 435 Hudson Street – 6th Floor, New York, New York 10014.

6.     Defendant Radical Media LLC (hereinafter "Radical Media") is a media and communications company that was founded by Jonathan Kamen and Frank Scherma and creates and produces films, television shows, documentaries and commercials. Radical Media is headquartered at 435 Hudson Street – 6th Floor, New York, New York 10014.

7.     Defendant Lisa Bryant (hereinafter, "Bryant") is an individual who is a director, showrunner and producer for Radical Media and who was the Executive Producer of the four-part Netflix Epstein series done through Leroy & Morton Productions and for Netflix, Inc.  On information and belief, Bryant is a citizen of New York. Bryant made explicit promises to Professor Dershowitz in Florida and elsewhere that she deliberately broke.

8.     Defendant Joseph Berlinger (hereinafter, "Berlinger") is an individual who is a producer for Radical Media, who resides in Katonah, New York and who was an Associate Producer of the four-part Epstein Netflix series done through Leroy & Morton Productions and for Netflix, Inc. Berlinger has a close relative who was friendly with Professor Dershowitz, which relationship Berlinger and Bryant exploited in order to lull Professor Dershowitz into accepting and believing in their false promises.

## JURISDICTION AND VENUE

9.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States: Professor Dershowitz is a citizen of Florida; Netflix, Inc. is a citizen of California and Delaware; Leroy & Morton Productions is a citizen of Delaware and New York; Radical Media is a citizen of New York; Bryant is a citizen of New York; and Berlinger is a citizen of New York.

10.     This Court has personal jurisdiction over Netflix, Inc., Leroy & Morton Productions LLC, Radical Media, Bryant and Berlinger on the grounds that these defendants conducted business within the State of Florida and their actions that are the subject of this action took place in the State of Florida.

11.     The Court also has personal jurisdiction over Netflix pursuant to Section 48.193(1)(a)(1), Florida Statutes, because the causes of action arise from Netflix "operating, conducting, engaging in, or carrying on a business venture in this state." Netflix continuously and systematically does business in Florida by streaming its content to subscribers residing in Florida, offering subscriptions to Florida residents via its website and engaging in film production activities in Florida with respect to *Filthy Rich* and other features. This Court also has personal jurisdiction over Netflix pursuant to Section 48.193(1)(a)(2), Florida Statutes, because the causes of action arise from Netflix "committing a tortious act within this state" by releasing *Filthy Rich* for viewing on its website, which contains false and defamatory statements about Professor Dershowitz, and was, and continues to be, accessed by Netflix's Florida subscribers. This Court also has personal jurisdiction over Netflix pursuant to Section 48.193(1)(a)(6), Florida Statutes, because the causes of action arise from Netflix "causing injury to persons…within this state arising out of an act or

omission by [Netflix] outside this state" and "at or about the time of the injury" Netflix was "engaged in solicitation or service activities within the state," and "products…processed, serviced, or manufactured anywhere" by Netflix "were used or consumed within this state in the ordinary course of commerce, trade, or use."

12.     The Court also has personal jurisdiction over Leroy & Morton Productions LLC, Radical Media, Bryant and Berlinger because the causes of action alleged against them arise from their commission of a tortious act within Florida by participating in, facilitating and causing the publication of defamatory content on Netflix Inc.'s website, namely *Filthy Rich*, for which they served in various capacities, and which contains false and defamatory statements about Professor Dershowitz and was, and continues to be, accessed in Florida by Netflix subscribers. Section 48.193 (1)(a)(2), Florida Statutes.

13.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. South Florida has a population of approximately 10 million people, thus making the alleged defamatory statements in this venue significant.

### FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A.     Professor Dershowitz's Acquaintance with and Representation of Epstein.**

14.     In August 1996, Professor Dershowitz met wealth manager Jeffrey Epstein ("Epstein") through an eminent mutual acquaintance, Lady Lynn Forester de Rothschild (then Lynn Forester), and Professor Dershowitz and Epstein thereafter maintained an academic relationship, along with many other academics, especially from Harvard University, where Epstein maintained an office and conducted seminars attended by distinguished professors in connection with a program he funded.

15.     In 2005, Epstein was investigated for sex crimes involving underage girls. Epstein retained Professor Dershowitz to be a part of Epstein's defense team to defend against the criminal charges. Along with other prominent attorneys such as Kenneth Starr, Roy Black, Jay Lefkowitz and Gerald Lefcourt, Professor Dershowitz helped negotiate a plea bargain in which Epstein agreed to plead guilty to a charge of soliciting prostitution under Florida state law. Epstein was sentenced to eighteen months in prison, and upon release, had to register as a sex offender.  Epstein also agreed to settle all future civil lawsuits filed against him by alleged victims.

16.     Although Professor Dershowitz was involved in the negotiation of Epstein's criminal plea bargain, Professor Dershowitz was not involved in drafting a formal non-prosecution agreement that was executed with respect to the criminal case and never negotiated any provision in the non-prosecution agreement that would have protected him from future prosecution (since he had done nothing that would warrant prosecution).

17.     Nor at the time was Professor Dershowitz accused or even suspected of any misconduct or anything remotely questionable, relating to Epstein or otherwise. Had there been any such suspicion, Professor Dershowitz would not have been allowed to represent Epstein. All Professor Dershowitz did was fulfill his professional obligations as a lawyer representing Epstein.

**B.      The CVRA Lawsuit and Giuffre's Joinder and Accusations.**

18.     In 2008, shortly after Epstein's plea agreement became public, several of Epstein's alleged victims brought a lawsuit against the U.S. Government under the Crime Victims' Rights Act alleging that prosecutors had failed to inform them of the plea. *Doe v. United States*, Docket No. 08-cv-80736 (KAM) (S.D. Fl. July 7, 2008) (hereinafter, "the CVRA lawsuit"). At the time of filing, Giuffre was not one of the alleged Epstein victims in the suit.

19.     <u>Six years</u> later, on December 30, 2014, Giuffre's attorneys, Bradley Edwards and Paul Casell, moved, in a public filing, to join Giuffre as a plaintiff in the CVRA lawsuit.  Giuffre's motion alleged that: (i) Giuffre had sex with several of Epstein's acquaintances, including Professor Dershowitz, (ii) Epstein required Giuffre to have sex six times with Professor Dershowitz, and (iii) Epstein trafficked Giuffre to other powerful men, including American politicians, business executives and foreign presidents.

20.     Giuffre's allegations against Professor Dershowitz were particularly suspect, given she had discussed Epstein numerous times over the previous years, and had *never* mentioned her alleged sexual interactions with Professor Dershowitz before she met her lawyers.

21.     By way of example:

    a.   In 2011, Giuffre gave an interview concerning her experiences with Epstein to the *U.K. Daily Mail*, for $160,000, and in that interview, Giuffre did *not* name Professor Dershowitz as one of her alleged abusers. She identified several other men, but *not* Professor Dershowitz.

    b.   In 2011, Giuffre was interviewed by journalist Sharon Churcher. On information and belief, in that interview, Giuffre mentioned several men as alleged abusers, but *not* Professor Dershowitz. She was shown pictures of prominent men who knew Epstein.

    c.   In 2012, Giuffre wrote a book manuscript detailing her sexual encounters with Epstein and his associates, in which she said she once saw Professor Dershowitz *discussing business* with Epstein, but did not say she met Professor Dershowitz and certainly never said that she had sex with him or was trafficked to him.

d.  In 2011, Giuffre was interviewed by federal agents concerning Epstein. On information and belief, in that interview, she accused others of sexual misconduct but again, did *not* identify Professor Dershowitz as one of her alleged abusers.

22.     In sum, Giuffre *never* accused Professor Dershowitz of having sex with her until after Giuffre met her attorneys in 2014 and sought to be included in the CVRA lawsuit.  According to her best friend, Giuffre told her she did not want to include Professor Dershowitz but was "pressured" to do so by her lawyers.

23.     On information and belief, Giuffre told her friend, Rebecca Boylan, that her attorneys pressured her to include Professor Dershowitz among the men with whom she alleged to have had sex, in order to help her get a multi-million-dollar settlement from the owner of Victoria's Secret and friend to Epstein, Les Wexner.

24.     Notably, in her motion to be included in the CVRA lawsuit, Giuffre's false accusations against Professor Dershowitz were filed in a public document, even though other pleadings and documents in the CVRA lawsuit were filed under seal. On information and belief, at the same time she publicly (and falsely) accused Professor Dershowitz, she underline privately accused Wexner and had her lawyers underline privately approach him.

25.     Because Giuffre's false accusations against Professor Dershowitz were filed in a public document, media outlets around the world began reporting on Giuffre's accusations that Professor Dershowitz had sexually abused her as a minor – a terribly damaging false accusation against a law professor and scholar.

26.     Undoubtedly, Giuffre's attorneys were aware that statements made in a judicial proceeding are generally immunized from tort liability – including defamation claims – and that, by publicly filing Giuffre's false allegations against Professor Dershowitz, they created a one-

8

sided situation in which Giuffre was free to sling mud at Professor Dershowitz essentially without repercussions.

27.    In response to the filing and the media attention on Giuffre's allegations, Professor Dershowitz vehemently denied the allegations in public statements and interviews, and accused Giuffre's attorneys of professional misconduct by knowingly filing a lawsuit containing falsehoods about him (or at least, failing to properly investigate their client's allegations).

28.    Giuffre's attorneys then filed a defamation claim against Professor Dershowitz; Professor Dershowitz filed a counterclaim. *Edwards v. Dershowitz*, Docket No. CACE-15-000072 (Fla. Broward County Ct. 2015).

29.    On April 7, 2015, U.S. District Judge Kenneth A. Marra, for the Southern District of Florida, under Rule 12(f) of the Federal Rules of Civil Procedure, struck Giuffre's allegations that she had sex with Professor Dershowitz from the CVRA lawsuit and noted that such action could be considered as a "sanction" against the lawyers. In doing so, the Court also reminded Giuffre's attorneys of their Rule 11 obligations in federal court "that all submissions be presented for a proper purpose and factual contentions have evidentiary support." *Doe v. United States*, Docket No. 08-cv-80736 (KAM) (S.D. Fl. Apr. 7, 2015) (ECF No. 324 in that action).

30.    Giuffre's accusations that she had sex with Professor Dershowitz are categorically false, and Professor Dershowitz has denied and disproved the accusations - including under oath subject to the penalties of perjury. Specifically, Professor Dershowitz has sworn under oath in affidavits and a deposition that he had never met Giuffre at the time she alleged their encounters occurred, and that he never had any sexual contact with Giuffre. Indeed, the only time that Professor Dershowitz ever met Giuffre was later in 2016 when Giuffre was deposed in the *Edwards/Dershowitz* Florida action.

31.     Professor Dershowitz has repeatedly pointed out that documentary evidence established that he could not have been and was not at the locations that Giuffre claimed to have had sex with Professor Dershowitz and that Giuffre was not a minor during the time period in which she claimed to have had sex with Professor Dershowitz, and that she has repeatedly lied about her age variously claiming she was 14, 15 and 16 when she met Epstein. Records prove she was 17 when she met Epstein in late 2000.

32.     As an investigation headed by former FBI Director Louis Freeh concluded, in a report dated April 8, 2016:

> Over the past several months, an independent investigation was conducted, under my supervision, by former senior federal law enforcement officials. We interviewed many witnesses and reviewed thousands of pages of documentary evidence.  Our investigation found no evidence to support the accusations of sexual misconduct against Professor Dershowitz. In fact, in several instances, the evidence directly contradicted the accusations made against him. In my opinion, the totality of the evidence found during the investigation refutes the allegations made against Professor Dershowitz.

## C.     The Boies Communications.

33.     On May 19, 2015, Professor Dershowitz met with David Boies ("Boies") of the law firm Boies Schiller Flexner LLP ("Boies Schiller") at the Sherry Netherland Hotel in New York City.

34.     Starting back in January 2015, after an interview that Professor Dershowitz gave on *The Today Show*, Professor Dershowitz had communications with Carlos Sires, an attorney in the Boies Schiller Florida office, initiated by Sires (whom Professor Dershowitz knew), about representing Professor Dershowitz in the *Edwards v. Dershowitz* lawsuit.

35.     Professor Dershowitz continued to have those communications with Sires until Professor Dershowitz, on February 10, 2015, received a letter from Nicholas Gravante, the General Counsel of the Boies Schiller firm, advising Professor Dershowitz of a conflict of interest in

10

representing Professor Dershowitz against Giuffre' lawyers. The Gravante letter did not describe the nature of the conflict that precluded the firm, but Professor Dershowitz subsequently learned that Sigrid McCawley and David Boies had been representing Giuffre on an ongoing basis and that Boies Schiller had a common interest agreement with Casell and Edwards. With that background, Professor Dershowitz met with Boies.

36.      At the May 19, 2015 meeting, Boies described the decision to name Professor Dershowitz in the CVRA lawsuit by Casell and Edwards as a self-inflicted wound, and that had he (Boies) been asked, he would have opposed inclusion of Professor Dershowitz in the Casell and Edwards filing for Giuffre in the CVRA lawsuit. Boies further said he was not authorized to negotiate a settlement in *Edwards v. Dershowitz* on behalf of Casell and Edwards.

37.      In the same meeting, Boies told Professor Dershowitz that: (i) he (Boies) did not believe Giuffre's accusations against Professor Dershowitz were true; (ii) that he (Boies) believed Giuffre was mistaken in naming Professor Dershowitz as someone with whom she had sex; (iii) that it was Boies's obligation to persuade Giuffre to acknowledge that Professor Dershowitz could not have been among the people with whom she had sex; (iv) that if he (Boies) could not persuade her, he would leave her representation to Edwards and Casell and no longer represent Giuffre; and (v) that he (Boies) was convinced that Professor Dershowitz did not and could not have had sex with Giuffre. Right after that meeting, Professor Dershowitz dictated a memorandum of the meeting.

38.      Both before and after the May 19, 2015 meeting with Boies, Professor Dershowitz spent several weeks putting together a comprehensive timeline of his whereabouts between August 2000 and September 2002, the time period in which Giuffre claimed to have been associated with Epstein.  Professor Dershowitz put together the timeline based on credit card records, medical

records, various TV appearances, phone records, contemporaneous journal entries and other documentary evidence.

39.     On June 1, 2015, Professor Dershowitz presented his timeline information to Boies and McCawley at a meeting at the Boies Schiller offices in New York City.  Professor Dershowitz said at the meeting that he was still collecting documentation. Boies said the more complete the records were, the better he would be able to persuade Giuffre that it was impossible that Professor Dershowitz was the person with whom she allegedly had six or more sexual encounters.

40.     At the end of the meeting, Boies said that he found the evidence compelling but that he wanted the evidence to be as complete as possible, that the attorneys for Giuffre who had put Professor Dershowitz's name in their pleading in the CVRA lawsuit had done a stupid and wrong thing and that Professor Dershowitz and he (Boies) should meet again when Professor Dershowitz had assembled more records. Right after that meeting, Professor Dershowitz sent an e-mail to his secretary describing the June 1, 2015 meeting.

41.     On July 6, 2015, Professor Dershowitz had another meeting with Boies and McCawley, with Professor Dershowitz's research assistant present in person, and Professor Dershowitz appearing by phone, to show them the documentary evidence against Giuffre's claims. Boies conducted a detailed examination of the timeline that was put together and repeatedly asked to look at phone records and financial documentation.

42.     The timeline disproved Giuffre's allegations against Professor Dershowitz. During the period of time in which Giuffre was in contact with Epstein, Professor Dershowitz did not visit Epstein's private island in the Caribbean, did not visit Epstein's ranch in New Mexico, did not stay at Epstein's house in Palm Beach and did not fly on Epstein's private jet. These were the places where Giuffre claimed to have had sex with Professor Dershowitz.

43.     At the conclusion of the meeting, Boies (who was knowledgeable about the chronology of events) told Professor Dershowitz that he (Boies) and McCawley would meet with Giuffre in the near future and try to convince her that she had made a mistake in identifying Professor Dershowitz as someone with whom she had sex. Boies asked for a memorandum detailing Professor Dershowitz's trips to South Florida, which was provided on condition that it not be shared with Casell and Edwards.

44.     After the July 6, 2015 meeting, Professor Dershowitz spoke with Boies, who acknowledged that it would have been impossible for Professor Dershowitz to be at the locations where Giuffre had alleged she had sex with Professor Dershowitz and that Giuffre was "wrong, simply wrong." Professor Dershowitz tape recorded conversations with Boies in which Boies stated that Giuffre was wrong and *could not have had sex with Professor Dershowitz as she claimed*.

45.     In April 2016, *Edwards v. Dershowitz* was settled, with Cassel and Edwards acknowledging that their public filing of Giuffre's accusations against Professor Dershowitz in the CVRA lawsuit was a mistake.

46.     After the settlement of Professor Dershowitz and Cassell and Edwards' cross-claims, Boies continued to express to Professor Dershowitz a belief that Giuffre's accusations against Professor Dershowitz were untrue. Throughout that same time, Boies and the Boies Schiller firm continued to represent Giuffre and, on information and belief, shared Professor Dershowitz's information with Casell and Edwards. Upon information and belief, Boies told one of Giuffre's attorneys that Professor Dershowitz was a fool for giving him (Boies) so much information.

47.     On April 16, 2019, Boies Schiller brought a defamation Complaint on behalf of Giuffre against Professor Dershowitz in the Southern District of New York. *Giuffre v. Dershowitz*, Docket No. 19-cv-03377 (LAP) (S.D.N.Y. Apr. 16, 2019). In her Complaint, Giuffre essentially claimed that Professor Dershowitz had defamed her by denying her false accusations against him.

48.     On June 7, 2019, Professor Dershowitz moved to disqualify Boies and the Boies Schiller firm from representing Giuffre, submitting, among other things, the tape recording in which Boies acknowledged that Giuffre was wrong to accuse Professor Dershowitz and that Professor Dershowitz could not possibly have had sex with Giuffre as she had alleged.

49.     On October 16, 2019, U.S. District Judge Lorettta A. Preska of the Southern District of New York ordered the Boies Schiller firm disqualified from representing Giuffre based on the witness advocate rule. On November 19, 2019, Professor Dershowitz interposed an Answer and defamation Counterclaim against Giuffre. That litigation is still ongoing.

**D.     The Bryant Communications, the Evidence  Provided to Defendants, and the Release.**

50.     On February 25, 2019, Bryant, using a Radical Media e-mail address, e-mailed Professor Dershowitz, identifying herself as a director and executive producer of an upcoming Netflix documentary series on Epstein and the role of wealth and power in the U.S. justice system. Bryant asked that Professor Dershowitz be interviewed for the Netflix Epstein series and explained there were two reasons: (i) Professor Dershowitz has known Epstein for years and represented him in criminal and civil matter, and Professor Dershowitz has been "dragged into the fray with accusations against you personally"; and (ii) Professor Dershowitz had represented may wealthy clients who were targeted, both fairly and unfairly, by the justice system. Bryant stated in her e-mail that "[w]e plan to tackle both sides of the issue." Bryant added "While many wealthy individuals can afford excellent representation -- they can also find themselves the victims of over-

zealous prosecution and over-reaching civil suits which 'normal' people would never have to face. You are uniquely experienced in such cases and we believe you could give much needed clarity and perspective to the series." Bryant included at the end of her e-mail a description of Radical Media.

51.     Professor Dershowitz, who was in Florida, responded the same day, February 25, 2019, by e-mail that he was "Happy to do it." Professor Dershowitz added that he had "only represented Epstein in the one criminal case in Florida." Bryant in turn that same day sent an e-mail to Professor Dershowitz asking what his schedule looked like over the next several weeks. Professor Dershowitz promptly responded with his schedule into April that had him in Miami Beach, Florida except for identified dates in March. Bryant e-mail back that March 4 and the morning of March 5 were available to do an interview of Professor Dershowitz, who e-mailed that those dates worked.  Bryant concluded the e-mail exchange of February 25, 2019, by setting March 5, 2019, as the date for the interview and accepted Professor Dershowitz's site. On February 28, 2019, Bryant confirmed with Professor Dershowitz the interview date of March 5, 2019, and promised to send to him Radical Media's standard appearance and location releases so that Professor Dershowitz could look at them in advance of the interview. Professor Dershowitz gave Bryant his address and cell.

52.     Bryant and Professor Dershowitz proceeded to have many conversations with regard to Professor Dershowitz's being interviewed for the Netflix Epstein series. In these conversations, Bryant repeatedly and expressly promised to put in the Netflix Epstein series all the evidence that Professor Dershowitz presented to her disproving Giuffre's allegations against Professor Dershowitz.

53. By way of example, Bryant *expressly* promised to include in the Netflix Epstein series: (i) the email correspondence between Giuffre and Churcher that clearly established that Giuffre and Professor Dershowitz had not had sex or even met; (ii) Giuffre's book manuscript, which discussed giving massages and having sex with Epstein and certain other individuals, but did not identify Professor Dershowitz as someone with whom she had sex; (iii) the tape recording in which Boies acknowledged that Giuffre was wrong to accuse Professor Dershowitz and that Professor Dershowitz could not possibly have had sex with Giuffre; (iv) the tape recording by Rebecca Boylan of an interview with Giuffre, in which Giuffre never mentioned having sex with Professor Dershowitz but rather, explained that she (Giuffre) was being pressured to accuse Professor Dershowitz of having sex with her; and (v) the investigation by Louis Freeh that concluded there was no evidence supporting the accusation that Professor Dershowitz had sex with Giuffre.

54. Relying on Bryant's express agreement that all of Professor Dershowitz's evidence would be included in the Netflix Epstein series, Professor Dershowitz provided the evidence described above to Bryant.

55. In connection with his appearance on the Netflix Epstein series, Professor Dershowitz was presented with an "Appearance Release." The Release, with a handwritten 3/5, stated, inter alia, that:

a. "Leroy & Morton Productions LLC ("Company"), with an address of 435 Hudson Street, 6th Floor, New York, New York 10014, may photograph and film/tape [Professor Dershowitz] and may record [Professor Dershowitz's] voice, conversation and sounds" and that Leroy & Morton Productions LLC would own the results and proceeds of such recordings;

16

b.   "Company agrees that Company shall not intentionally portray [Professor Dershowitz] in a defamatory manner in the Program";

c.   "[Professor Dershowitz's] sole remedy under this Release shall be an action at law for money damages"; and

d.   The Release "shall be governed by the laws of the State of New York".

56.     During the interview of Professor Dershowitz for the Netflix Epstein series, Bryant suggested that Professor Dershowitz directly challenge Giuffre to accuse him of misconduct on camera (as she had previously only done so through liability-insulated judicial proceedings).

57.     Professor Dershowitz said he would do so on three conditions. First, Bryant would expressly include the fact that Professor Dershowitz issued this challenge in order to be able to sue her outside the litigation privilege. Second, Bryant would tell Professor Dershowitz if Giuffre accepted Professor Dershowitz's challenge. Third, Bryant would give Professor Dershowitz an opportunity to respond directly to Giuffre, on camera, if Giuffre accepted Professor Dershowitz's challenge and accused Professor Dershowitz on camera. Bryant expressly agreed to these conditions, but, as will be explained *infra*, subsequently broke her agreement as to all of these conditions.

58.     An interview was held on March 5, 2019, at Professor Dershowitz's apartment in Miami Beach, Florida. At that time, Professor Dershowitz introduced Bryant to  Professor Dershowitz's wife Carolyn and showed Bryant, among other things, pictures of Professor Dershowitz's famous clients and Professor Dershowitz's wife.

59.     In subsequent discussions about the series, Bryant said she was on Professor Dershowitz's side and that an associate producer, Berlinger, would also be supportive of Professor Dershowitz, as Berlinger was related to a friend of Professor Dershowitz. Bryant said that she

believed Professor Dershowitz's denial of Giuffre's accusations of sexual misconduct and that the

Netflix Epstein series would fully present Professor Dershowitz's side of the story.

60.     On March 7, 2019, after the interview, Bryant, using a Radical Media e-mail

address, e-mailed Professor Dershowitz:

> Thank you very much for your time earlier this week and please extend our thanks to your lovely wife Carolyn. It was an honor interviewing you - I thoroughly enjoyed it and appreciate your candor and perspective and do think it has not been explored at all. We have the time and the forum to tell both full sides of the story and will do so. It would be great if in the coming days or weeks you can email or send me some personal photos of you growing up, from law school, with your lovely wife (I loved the story of how you met!) and any special ones over the years of you with some of the famous clients you've represented (O.J., Leona Helmsley, Mike Tyson, etc. and of course Mr Epstein). If you have any photos of him or you and he together or your defense team for Epstein, all of those would help tell your story more fully.

> And of course, if you would be so kind as to ask Mr. Epstein if he would do an interview with us, it would be greatly appreciated. I know he hasn't spoken out before but we would give him the proper platform to tell his story and treat him fairly on our 4 hour documentary series.

> Thank you again for letting us into your home.

61.     On March 27, 2019, Bryant using a Radical Media e-mail address, e-mailed

Professor Dershowitz:

> I hope you are well. I've enjoyed reading the copy of your new book that you gave me after our interview...and in reading Chapter 20, I read that you recorded your interview with Rebecca. Can I obtain a copy of that to use in the show? I do have a copy of portions of the transcript of Rebecca's interview, but the audio would be much better and help tell your side of the story far better than just the transcript.

> I believe you said you were in New York this week so if you have time, I'm reminding you to have someone send or email the personal photos we spoke about - of you growing up, from law school, with your lovely wife Carolyn and family, and any special photos you have over the years of you with some of the famous clients you've represented - (O.J., Leona Helmsley, Mike Tyson, etc. and of course Mr. Epstein). If you have any photos of your Epstein defense team, Jeffrey or the two of you together anywhere, all of those would help tell your story as well.

18

62.     Professor Dershowitz, who was in Miami Beach, Florida, replied that same day:

Back in ny on April 10. Happy to give you Rebecca tape and play Boies tape in which he admits his client is "wrong", "simply wrong".

Bryant, using a Radical Media e-mail address, in turn quickly responded:

Fantastic. Is there a file you can email or I can meet you somewhere the week of April 10th and pick it up along with the photos? Also might be interesting to have you play it for our cameras and explain.

Let me know your thoughts.

Professor Dershowitz replied in an e-mail proposing that he and Bryant meet after April 10, 2019.

63.     On April 11. 2019, Bryant, using a Radical Media e-mail address, e-mailed Professor Dershowitz:

You asked me to reach out after April 10th regarding the audio of your interview with Rebecca and the photos of your family, life, etc. So I'm reaching out! Are you in NY currently and do you have time to drudge up those photos and the audiotape while you're here? Please let me know your schedule.

Professor Dershowitz responded within the minute that he was in New York and could meet the following week.

64.     On May 8, 2019, Bryant, using a Radical Media e-mail address, e-mailed Professor Dershowitz:

I hope you are well. I've been meaning to check back in with you regarding the personal photos you said you'd provide to us for the documentary. Ones from your storied history in the legal field and of your family, plus the Rebecca tapes when you have time. Are you still in New York? If so, would be great to get this week as we are starting to edit soon.

We were hoping to get candid photos of (not professionally taken ones):
-you and wife Carolyn, any other family photos
-you in early legal days such as courtroom shots, graduation, at Harvard, with famous clients like OJ, Leona, Claus, etc.
-any photos of you with Epstein, or ones taken at that one holiday spent at his home
-the tape recording of Rebecca re: Virginia Roberts

Please let me know if there's a good day and a convenient way to get these items
from you.

Professor Dershowitz replied by e-mail that same day he was in Israel but would be back on the

following Monday (May 13) and would look for what Bryant requested as soon as he got back.

65.    On May 28, 2019, Bryant, using a Radical Media e-mail address, e-mailed

Professor Dershowitz:

I was out of town to follow up a couple of weeks ago when you got back from
Israel. Any chance this week is good to get these photos and audio from you?

Professor Dershowitz replied by e-mail within the half-hour that he was travelling, but would be

in New York the following week.

66.    On June 5, 2019, Bryant, using a Radical Media e-mail address, e-mailed Professor

Dershowitz:

Hope you are well. You mentioned you'd be back in NY this week. Is it possible to
get your old photos and the audio requested earlier this week? We are in edit now
on the project so it would be great to have them and be able to show a more personal
side and tout your prestigious career.

Here's a reminder of the personal photos, etc. we spoke about:
- you growing up,
-from law school
- with your lovely wife Carolyn and family,
- any special photos you have over the years of you with some of the famous clients
you've represented - (O.J., Leona Helmsley, Mike Tyson, etc. ).
-If you have any photos of you with any members of the Epstein defense team,
-Jeffrey or the two of you together anywhere
-taped recording with Rebecca,

Please let me know when and how we can get these from you. I also wanted to
remind you that Joe Berlinger is an Executive Producer on this project and we of
course will be fair and balanced in our storytelling.

Professor Dershowitz replied by e-mail within the hour asking Bryant if she could come over to

the apartment of his wife and him; Bryant, using a Radical Media e-mail address, e-mailed

Professor Dershowitz they could meet either that day or Friday (June 7, 2019); and Professor Dershowitz replied by e-mail that Friday (June 7, 2019) would work.

67.      On June 6, 2019, Bryant, using a Radical Media e-mail address, e-mailed Professor Dershowitz, agreeing to Friday and asking to bring a cameraman. Professor Dershowitz asked why the cameraman, and Bryant, using a Radical Media e-mail address, e-mailed Professor Dershowitz:

> You just mentioned it would take a couple of hours so I wasn't sure if you wanted me to tell me something new or capture anything on camera.  You can tell me about the photos and other things on camera if you want. It's up to you.

Professor Dershowitz e-mailed back: "Ok. Bring camera." Bryant, using a Radical Media e-mail address, e-mailed Professor Dershowitz "See you at 2."

68.      On June 7, 2019, Bryant went to Professor Dershowitz's apartment with a cameraman. Professor Dershowitz answered Bryant's question and reviewed with Bryant pictures in which Bryant was interested, and Professor Dershowitz gave the Rebecca tape to Bryant.

69.      Professor Dershowitz's book *Guilt By Association* concerns and discusses the evidence that established Professor's Dershowitz's innocence as to Ms. Giuffre's accusations. That book thus reviews much of the same evidence that Professor Dershowitz provided Ms. Bryant concerning Ms. Giuffre's false accusations. Professor Dershowitz told Ms. Bryant about the book *Guilt By Association*, and Ms. Bryant said she looked forward to reading the book. Professor Dershowitz's book *Guilt By Association* was published November 19, 2019 and was available on Kindle on that date; pre-order purchases began at least by October 3, 2019. *Filthy Rich* was first aired on or about May 29, 2020. There was ample opportunity for Netflix, Inc., Radical Media LLC and filmmakers Leroy & Morton Productions LLC, Ms. Lisa Bryant and Mr. Joseph Berlinger

to review the evidence and information presented in *Guilt By Association* and edit *Filthy Rich* not to defame Professor Dershowitz.

**E.** **The Netflix Epstein Series *Filthy Rich*.**

70.    On or about May 27, 2020, the four-part Netflix Epstein series entitled *Filthy Rich*, produced by Bryant and Berlinger, first became available to viewers on the Netflix streaming service.

71.    *Filthy Rich* primarily portrays Epstein as a bad person, a pedophile without remorse who deserved to be locked up for a long time, and his "victims" as emotionally damaged young women whose Crime Victims Rights Act ("CVRA") lawsuit brought about an overturning of the 2008 federal plea deal that Professor Dershowitz, with some other reputable lawyers, had negotiated with the Department of Justice for Epstein (and that the "victims" had viewed as outrageously lenient in resulting in less than 18 months jail time that included work release hours). While other aspects of Epstein's life were portrayed (*e.g.*, Epstein, the philanthropist), the dominant theme is Epstein's sex life and the young women whom he damaged, ending with the "triumph" of the 2019 prosecution of Epstein -- complete with showing the women walking with Brad Edwards and David Boies toward and into the U.S. Courthouse for the Southern District of New York.

72.    *Filthy Rich* is told largely through the interviews of the former Palm Beach Police Chief Michael Reiter, CVRA attorney Brad Edwards, Boies Schiller and victims' attorney Sigrid McCawley and a number of the "victims," including Giuffre. Numerous times in *Filthy Rich*, Giuffre is shown in interviewed comments. Professor Dershowitz is interviewed to defend the 2008 plea bargain and to deny Giuffre's accusation that by arrangement through Epstein, Giuffre had sex with Professor Dershowitz six times.

73.     In the Netflix Epstein series *Filthy Rich*, Professor Dershowitz's denial and Giuffre's accusation, which accusation is included in the Brad Edwards CVRA lawsuit, come off as a "he said/she said" conflict with the misleading written statement shown that Professor Dershowitz and Giuffre have sued each other for defamation (with no elaboration).

74.     It wasn't a "he said/she said" situation, however, given Professor Dershowitz's totality of the evidence establishing he never had sex with Giuffre. To have presented that evidence in *Filthy Rich*, as had been promised, would have undercut the credibility of Brad Edwards, Sigrid McCawley and Giuffre -- the very people whose interviewed comments *Filthy Rich* depended upon.

75.     Giuffre's accusations against Professor Dershowitz appear to carry some credibility in *Filthy Rich* in part because of a particular feature of *Filthy Rich*: the story jumps around chronologically. A year dating of events appears on the screen before segments, but the segments themselves do not occur in chronological order. Had the story been told in a strict chronological sequence, it would have been evident that Giuffre's years with Epstein, 1999-2002, occurred about five years <u>before</u> Professor Dershowitz started working on defending Epstein for what would be the 2008 federal plea deal.

76.     Before Giuffre made her accusation against Professor Dershowitz, Professor Dershowitz never had met Giuffre or even heard of Giuffre, much less had sex with her. Indeed, for years when discussing her time with Epstein, Giuffre never made any allegations against Professor Dershowitz, only doing so for the first time after her attorneys apparently pressured her to do so for the CVRA lawsuit (and, on information and belief, to serve as a "warning shot" to Les Wexner for the purpose of quietly extracting a monetary settlement).

77.    Had the story been presented chronologically, it would have been much more evident that Giuffre's short time with Epstein long pre-dated Professor's Dershowitz's representation of Epstein, meaning the two <u>never</u> overlapped in their employment with Epstein (or even came close to such), and that Giuffre's allegations against Professor Dershowitz were apparently invented over a decade <u>after</u> Giuffre left Epstein.

78.    But, with the chronology jumbled, Giuffre's lack of credibility as to her claims against Professor Dershowitz is cleverly obscured.  To present the facts in a more straightforward manner would have undercut the credibility of people whose interviewed comments *Filthy Rich* depended upon in order to make out its intended narrative.

79.    Obscuring the timeline is not the only editorial trick Defendants employed to bolster Giuffre's false claims against Professor Dershowitz. Defendants also "sandwiched" Giuffre's entirely unsubstantiated and unsupported claims against Professor Dershowitz in between segments addressing her claims against <u>other</u> individuals for whom the documentary purports there was at least some supporting evidence.

80.    By way of further explanation, Giuffre's accusation against Professor Dershowitz appears in the middle of *Filthy Rich*. Before the exchange, *Filthy Rich* discusses whether Epstein had sex with Giuffre (then Roberts) on her 16th birthday, using one of the Brad Edwards video deposition clips of Epstein. (Epstein's reaction, when asked, was to say "are you kidding me?") The clip showing Epstein being asked about having sex with Giuffre (then Roberts) on her 16th birthday is followed by a sequence about Prince Andrew allegedly having sex with Giuffre (then Roberts) when she was 17, at the time she was associating with Epstein and Maxwell. Prince Andrew is shown as denying having sex with Giuffre (then Roberts), but then the picture of a younger Prince Andrew, younger Giuffre (then Roberts) and younger Maxwell is

shown with Giuffre saying how Maxwell told her that she (Giuffre) would have to do with Prince Andrew what she had done with Jeffrey. The obvious implication by showing the picture is that Giuffre's claims are credible and those who deny her claims are not.

81.     It is then, _after_ showing Giuffre's accusation, Prince Andrew's denial, and Giuffre's purported evidence in support, that Giuffre's accusation against Professor Dershowitz is presented.

82.     Professor Dershowitz speaks unequivocally and forcefully in denying the accusation, denying even meeting Giuffre and in challenging Giuffre to directly accuse him, rather than making the claims indirectly in other litigation. Giuffre is then shown as making her (false) accusation of having sex with Professor Dershowitz at Epstein's arrangement, saying she had sex with Professor Dershowitz approximately six times. Giuffre defamed Professor Dershowitz by falsely accusing him.

83.     Unlike in Prince Andrew's case, no photograph was shown depicting Professor Dershowitz with Giuffre, and no such photograph exists because Giuffre had stopped being with Epstein in 2002 and Professor Dershowitz did not start representing Epstein until about five years later. But _Filthy Rich_ skips over this inconvenient fact and quickly moves on to such subjects as Epstein's apartment being full of framed pictures and paintings of nude women, Giuffre's assertion that she saw Bill Clinton at Epstein's island in the U.S. Virgin Islands (which is apparently backed up with shots of the plane logs showing Bill Clinton going to Epstein's island) and then back to the allegations of Prince Andrew having sex with Giuffre (then Roberts).

84.     The segment about Giuffre's accusation against Professor Dershowitz was sandwiched between segments that lent credibility to Giuffre despite Defendants' actual knowledge that Giuffre did not have a shred of supporting evidence for her claims against

Professor Dershowitz, and, to the contrary, Professor Dershowitz had extensive support <u>disproving</u> Giuffre's allegations against him.

85.     Giuffre is shown expressing joy about Epstein's 2019 prosecution; and twice during the Netflix Epstein series *Filthy Rich*, Giuffre talks about "getting" others associated with Epstein. Relatedly, a certain amount of anger/disdain is directed at Professor Dershowitz for having been a principal negotiator of the 2008 federal plea deal, which the Netflix Epstein series uses in order to convey a broader impression of Dershowitz as someone materially involved in Epstein's alleged sex trafficking, rather than simply a defense attorney doing his job.

86.     The Netflix Epstein series *Filthy Rich* thus provided a one-sided narrative deliberately supportive of Giuffre, and in that context, published Giuffre's defamatory accusation that Professor Dershowitz had sex with her, and deliberately, knowingly, and intentionally presented such allegation (and Giuffre herself) as credible and well-supported. While the Netflix Epstein series *Filthy Rich* did show Professor Dershowitz denying Giuffre's accusations, the series did *not*, as promised, discuss, reference, or even acknowledge the substantial evidence supplied by Professor Dershowitz showing that Giuffre's accusations were false and that she was not a credible accuser.

87.     The portion of *Filthy Rich* concerning Giuffre's false allegations against Professor Dershowitz presented anew those allegations and was not a report of proceedings in any litigation. There was, after the presentation of Giuffre's accusation against Professor Dershowitz and Professor Dershowitz's denial, a reference to the litigation between the two. But *Filthy Rich* did not package the Giuffre's accusation against Professor Dershowitz and Professor Dershowitz's denial as a report on the litigation. Giuffre defamed Professor Dershowitz directly in *Filthy Rich*.

88.     Contrary to Defendants' express promises, the Netflix Epstein series *Filthy Rich* did not include any of the material that Professor Dershowitz had provided Bryant for inclusion with respect to Giuffre, to wit: the email correspondence between Giuffre and Churcher; Giuffre's book manuscript; the tape recording in which Boies acknowledged that Giuffre was wrong to accuse Professor Dershowitz and that Giuffre could not possibly have had sex with Professor Dershowitz; the tape recording by Rebecca Boylan; and the investigation by Louis Freeh that concluded there was no evidence supporting Giuffre's accusations. Moreover, Defendants purposefully excluded all portions of Professor Dershowitz's interviews wherein this evidence was discussed/referenced.

89.     The Netflix Epstein series *Filthy Rich*, in setting forth a deliberately one-sided narrative, relied upon stories of three alleged Epstein victims: Giuffre, Sarah Ransome and Maria Farmer. All three were clients of Boies, who appears briefly in the Netflix Epstein series *Filthy Rich*.

90.     These women were all portrayed in the Netflix Epstein series *Filthy Rich* as solemn and fully credible accusers. Not presented was anything that called into question the credibility of any of these individuals, even though Professor Dershowitz had provided to Bryant evidence that not only eviscerated the credibility of Giuffre as to her accusations against Professor Dershowitz, but also undermined the credibility of Sarah Ransome and Maria Farmer.

91.     By way of example, the Netflix Epstein series *Filthy Rich* did not include reference to the fact that Sarah Ransome had, in a series of e-mails to a *New York Post* reporter, accused Hillary Clinton, Donald Trump, Bill Clinton, Richard Branson and others of pedophilia, rape and other crimes, and claimed to have video evidence (sex tapes) of such alleged crimes, but then

ultimately admitted to Connie Bruck of *The New Yorker* that she (Ransome) had made up these claims.

92.     Professor Dershowitz showed to Bryant his memorandum of his conversation with investigative reporter and *New York Post* columnist Maureen Callahan about Ransome's debunked false accusations and suggested she contact Callahan. Bryant told Professor Dershowitz that she already knew about the false accusations and that Sarah Ransome had no credibility.  She promised to include this evidence in the series.

93.     Yet, Sarah Ransome was presented in the Netflix Epstein series *Filthy Rich* as a credible witness, and the parts of Professor Dershowitz's interview(s) that mentioned the evidence against Sarah Ransome's credibility were excluded (nor was any reference made to Ransome's history and admission of falsely accusing others).

94.     Similarly, the Netflix Epstein series *Filthy Rich* did not include reference to the fact Maria Farmer could not have seen Professor Dershowitz in Epstein's house because Maria Farmer had stopped working for Epstein before Professor Dershowitz even met Epstein. Professor Dershowitz had informed Bryant of that fact, too. Yet, Maria Farmer was presented in the Netflix Epstein series *Filthy Rich* as a credible witness.

95.     Professor Dershowitz's travel records proved that he could not have been on Jeffrey Epstein's Caribbean Island and New Mexico ranch where and when Ms. Giuffre said the sex occurred. That was the conclusion of former FBI Director Louis Freeh, and that was also why David Boies said his client Giuffre's accusations against Professor Dershowitz were "wrong, wrong, wrong." Instead, the Defendants Netflix, Leroy & Morton Productions, Radical Media LLC, Bryant and Berlinger intentionally, knowingly and deliberately presented a false and defamatory narrative in order to better fit with the intended theme of the series: presenting Jeffrey

Epstein and anyone in his orbit as a monster and presenting Ms. Giuffre and Ms. Ransome as innocent and credible. Millions watched *Filthy Rich* and were presented with a "she said/he said" dispute between Professor Dershowitz and Ms. Giuffre, which was false and materially misleading and certainly not "fair and balanced," and which resulted in many of those viewers believing Ms. Giuffre's completely baseless defamatory accusations against Professor Dershowitz.

96.     The foregoing omissions were not a simple reflection of editorial judgment, but rather, indicate a malicious, deliberate, knowing, conscious publication of defamatory accusations, by witnesses known by Defendants to be non-credible, edited and presented in such a manner to bolster the credibility of the accusers and preclude any consideration of relevant, material, exculpatory evidence, thus constituting defamation as well as defamation by implication.

97.     Netflix, Inc. at some point in time after the initial presentation of the Epstein series *Filthy Rich* began to advertise the series with Professor Dershowitz's picture in the place of Jeffery Epstein's on some of its screens. The use of Professor Dershowitz's picture in this manner serves to conflate subconsciously the images of Jeffrey Epstein and Professor Dershowitz in people's minds. The Defendants knew they were publishing a direct defamation by Giuffe of Professor Dershowitz, not a report of a judicial proceeding.

98.     The Netflix Epstein series *Filthy Rich* imparted, supported, and co-signed the defamatory, false accusations that Giuffre has made against Professor Dershowitz, and the Netflix Epstein series *Filthy Rich* was intended to endorse those accusations even though the Defendants knew that Guiffre's accusations against Professor Dershowitz were false. As a direct result of the false and defamatory portrayal of Professor Dershowitz in the four-part Netflix Epstein series *Filthy Rich*, a majority of viewers and others came to believe that Professor Dershowitz had sex with Guiffre.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Defamation)

99.     Professor Dershowitz repeats and re-alleges each and every allegation above in paragraphs 1 through 98 as if fully set forth herein.

100.    Each of the Defendants played a role in the production and publication of the four-part Netflix Epstein series *Filthy Rich*. Bryant is a director, showrunner and producer for Radical Media and was the Executive Producer of the four-part Netflix Epstein series *Filthy Rich* which was done through Leroy & Morton Productions and for Netflix, Inc.. Berlinger is a producer for Radical Media and was an Associate Producer of the four-part Epstein Netflix series *Filthy Rich* which was done through Leroy & Morton Productions and for Netflix, Inc.

101.    Under New York law, false statements of fact which impugn one's reputation, and which are made without privilege, are defamatory. False imputations of a crime are defamatory per se.

102.    Under New York law, defamation by implication occurs when the language of the communication, as a whole, can be reasonably read to impart a defamatory inference, and the author/creator intended or endorsed that inference.

103.    Defendants defamed Professor Dershowitz in the Netflix Epstein series with a non-privileged defamatory implication of fact that was culpably published ("actual malice"), and which damaged Professor Dershowitz's reputation.

104.    The Netflix Epstein series presents Giuffre as an honest and credible survivor of sexual assault, and provided a platform for Giuffre to, *inter alia*, falsely accuse Professor Dershowitz of egregious sexual misconduct, including sex with a minor.

105.    The portion of *Filthy Rich* concerning Giuffre's false allegations against Professor Dershowitz presented anew those allegations and was not a report of proceedings in any litigation.

30

106.    The Netflix Epstein series was intended to, and did, affirm and bolster the claims and credibility of the accusers by knowingly and deliberately failing to present evidence in Defendants' possession which, at the very least, cast serious doubt on, if not affirmatively disproved, Giuffre's allegations against Professor Dershowitz, as well as evidence of patent credibility issues with the other accusers, such as Ransome's *admitted* prior false allegations of sex abuse against high-profile individuals.

107.    By declining to present any evidence that would in any way call into question Giuffre's credibility, and in particular, the credibility of her accusations against Professor Dershowitz, despite having actual knowledge and possession of the evidence that demonstrates the falsity of the allegations and knowing the chronology that Giuffre stopped working in 2002 with Epstein and went with her husband to live in Australia years before Professor Dershowitz was employed by Epstein in connection with what would be the 2008 federal plea deal, the Netflix Epstein series, as a whole, effectively presented as a purported fact that Professor Dershowitz engaged in criminal sexual misconduct including sexual activity with a minor.

108.    The aforesaid defamatory factual implication is false. Professor Dershowitz did not have sex with Giuffre *ever*, let alone when she was a minor. Many viewers have written on Twitter and other social media platforms that after viewing the Netflix series they now believe Professor Dershowitz had sex with Giuffre when she was a minor.

109.    The aforesaid defamatory, false factual implication is defamatory *per se* against Professor Dershowitz because Professor Dershowitz is accused of a crime of a salacious nature, subjecting Professor Dershowitz to public contempt, aversion, disgrace, induce an evil opinion in the minds of right-thinking persons and deprive him of friendly interaction in society.

110. The aforesaid defamatory, false factual implication is not privileged, as the fair report privilege does not apply here.

111. First, the Netflix Epstein series was entitled *Filthy Rich*, which was the title of a well-known book on the same topic by author James Patterson; however, Patterson's book does not imply that Professor Dershowitz is guilty of having sex with Giuffre but rather, affirmatively states there is *no evidence that Professor Dershowitz ever had sex with Giuffre*.

112. Nor is the Netflix Epstein series a fair report of *Giuffre v. Dershowitz*, as a fair report would include the fact that Giuffre's lawyer who brought the case, Boies, was disqualified based on the witness advocate rule and a record that included a tape recording in which Boies acknowledged that Giuffre was wrong to accuse Professor Dershowitz and that Dershowitz could not possibly have had sex with Giuffre.

113. The aforesaid defamatory, false factual implication was culpably uttered ("actual malice"). Defendants, through Bryant, possessed and were well-aware of the evidence that established that Giuffre's accusation that Professor Dershowitz had sex with her when she was a minor was false. Specifically, Defendants, through Bryant, knew about:

a. The email correspondence between Giuffre and Churcher that demonstrates that Professor Dershowitz did not have sex with Giuffre;

b. Giuffre's book manuscript that discussed giving massages and having sex with Epstein and certain other individuals but never identified Professor Dershowitz as someone with whom she had sex;

c. The tape recording in which Boies acknowledged that Giuffre was wrong to accuse Professor Dershowitz and that Professor Dershowitz could not possibly have had sex with Giuffre;

d.   The tape recording by Rebecca Boylan of an interview with Giuffre in which Giuffre never mentioned having sex with Professor Dershowitz, but rather, said that she (Giuffre) was being pressured to accuse Professor Dershowitz of having sex with her;

e.   The investigation and report by Louis Freeh that concluded there was no evidence supporting the accusation that Professor Dershowitz had sex with Giuffre.

114.   Moreover, in discussions with Professor Dershowitz, Bryant acknowledged that she did not believe the accusations against him and wanted to give Professor Dershowitz the opportunity to disprove them in the series. She also expressly acknowledged that merely having to "deny" the allegations would not be persuasive, but that the evidence Professor Dershowitz gave her would be persuasive.

115.   Defendants thus had actual knowledge that Giuffre's accusations against Professor Dershowitz were false and/or entertained serious doubts about the veracity of the claims, yet maliciously, deliberately and knowingly presented Giuffre as a credible witness, and knowingly and intentionally excluded information showing that Giuffre, and specifically her accusation against Professor Dershowitz, was not credible.

116.   Accordingly, Defendants acted with "actual malice" when publishing the four-part Netflix Epstein series *Filthy Rich*.

117.   The aforesaid non-privileged defamatory, false factual implication culpably and with actual malice published was damaging to Professor Dershowitz's standing as a law professor and scholar, effecting personal and professional reputational harm, lost business opportunities, emotional harm, embarrassment, humiliation and pain and suffering.

*118.*   This defamation claim is not barred by the Appearance Release dated March 5, 2019, as that Release expressly stated that "Company [Leroy & Morton Productions LLC] agrees that Company s*hall not intentionally portray [Professor Dershowitz] in a defamatory manner in*

*the Program*." Bryant made additional representations and assurances both before and after the release was signed.

119.    By refusing to show, discuss, address, or even acknowledge the extensive evidence disproving Giuffre's claims that Professor Dershowitz had sex with her as a minor, and by presenting Giuffre as an honest and credible witness, the Netflix Epstein series intentionally, knowingly, maliciously and deliberately defamed Professor Dershowitz.

120.    As a direct and proximate result of the above conduct, Professor Dershowitz has suffered substantial damages in the form of personal and professional reputational harm, lost business opportunities, emotional harm, embarrassment, humiliation and pain and suffering. Such damages are reflected in, among other things, social media posts taunting Professor Dershowitz over liking having sex with underage girls.

121.    Thus, Defendants are liable to Professor Dershowitz for damages in an amount to be determined at trial, as well as punitive damages due to Defendants' actions as willful, wanton and malicious.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Breach of Contract)**

122.    Professor Dershowitz repeats and re-alleges each and every allegation above in paragraphs 1 through 98 and paragraphs 101 through 120 as if fully set forth herein.

123.    The Appearance Release, dated March 5, 2019, was an enforceable agreement in which, among other things, "Company [Leroy & Morton Productions LLC] agrees that Company shall not intentionally portray [Professor Dershowitz] in a defamatory manner in the Program" and Professor Dershowitz is entitled to a remedy of "an action at law for money damages"

124.    Professor Dershowitz performed under the Agreement by sitting for interviews for the Netflix Epstein series *Filthy Rich*; however, Leroy & Morton Productions LLC, through its

agents Bryant, Berlinger and Radical Media for the Netflix Epstein series *Filthy Rich*, breached the Appearance Release by intentionally portraying Professor Dershowitz in the defamatory manner in the Netflix Epstein series *Filthy Rich* as described at length above.

125.     As a direct and proximate result of the above stated breach of contract, Professor Dershowitz has suffered substantial damages in the form of lost business opportunities, economic injuries and other direct and consequential damages.

126.     Thus, Defendants are liable to Professor Dershowitz for the foreseeable and proximate harm resulting from their breach, including for the lost business opportunities, economic injuries and other direct and consequential damages.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Promissory Estoppel)

127.     Professor Dershowitz repeats and re-alleges each and every allegation above in paragraphs 1 through 98 as if fully set forth herein.

128.     Bryant, on behalf of and as agent for Leroy & Morton, Radical Media and Berlinger, made certain promises to Professor Dershowitz to induce him to participate in the Netflix Epstein series, and to issue a challenge to Ms. Giuffre as part of said participation, that if Professor Dershowitz did as they asked, they would present his side of the story fully, and would present evidence in support of his innocence within the series. These promises were made both before and after the release was signed.

129.     Defendants should have expected Professor Dershowitz to rely on said promises when accepting their request for an interview and participating in the interview as they suggested.

130.     Professor Dershowitz reasonably relied, to his detriment, on these express promises and representations made by Defendants through Bryant. On the basis of an express agreement that included in the Netflix Epstein series *Filthy Rich* would be all the evidence that Professor

35

Dershowitz presented to Defendants showing that Giuffre's accusation that Professor Dershowitz had sex with her as a minor was false, Professor Dershowitz participated in interviews and provided to Bryant the email correspondence between Giuffre and Churcher, the Giuffre book manuscript, the tape recording in which Boies acknowledged Giuffre was wrong, the tape recording by Rebecca Boylan and the investigation by Louis Freeh.

131. Defendants broke their promises to put in the Netflix Epstein series all the evidence that Professor Dershowitz presented to Defendants showing that Professor Dershowitz did not have sex with Giuffre. Defendants are therefore estopped from denying those promises.

132. As a direct and proximate result of the above conduct, Defendants are liable to Professor Dershowitz for substantial damages in the form of personal and professional reputational harm, lost business opportunities, economic injuries and other direct and consequential damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Fraudulent Inducement)

133. Professor Dershowitz repeats and re-alleges each and every allegation above in paragraphs 1 through 98 as if fully set forth herein.

134. Bryant, on behalf of and as agent for Leroy & Morton, Radical Media and Berlinger, made certain false representations to Professor Dershowitz regarding their intentions for asking Professor Dershowitz to do a series of interviews for the Netflix Epstein series *Filthy Rich*. Defendants made and are responsible for false statements to Professor Dershowitz that they were on Professor Dershowitz's side, that they wanted to present his side of the story, and that Defendants would put in the Netflix Epstein series *Filthy Rich* all the evidence that Professor Dershowitz presented to them showing that Giuffre's accusation that Professor Dershowitz had sex with her as a minor was false. Professor Dershowitz sat for three interviews and held a number of telephone calls in reliance on Defendants' false promises.

36

135.    Defendants knew or should have known this representation was false at the time it was made, as Defendants had intended from the start to base the series on the claims of alleged Epstein victims, and to present these women as credible, and to bolster and strengthen their credibility and their claims, and that as such, Defendants were not interested in Professor Dershowitz's innocence and would not present evidence or information that undercut the accusers' credibility or cut against the whole theme and purpose of the project.

136.    Defendants intended Professor Dershowitz to rely on these false representations in agreeing to participate in the Netflix Epstein series and provide relevant information and evidence, and Professor Dershowitz did rely on such false representations in doing these things, to his detriment.

137.    As a direct and proximate result of the above conduct, Professor Dershowitz, in justifiable reliance on Defendants' inducement, has suffered substantial damages in the form of personal and professional reputational harm, lost business opportunities, economic injuries and other direct and consequential damages.

138.    Defendants are therefore liable to Professor Dershowitz in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Professor Dershowitz demands judgment against Defendants as follows:

(i)    on the first cause of action, for defamation, a judgment against the Defendants awarding to Professor Dershowitz compensatory damages in an amount to be determined at trial, but in any event, no less than $20,000,000, as well as punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

   (ii) on the second cause of action, for breach of contract, a judgment against the Defendants awarding to Professor Dershowitz damages in an amount to be determined at trial, but in any event, no less than $20,000,000, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

   (iii) on the third cause of action, for promissory estoppel, a judgment against the Defendants awarding to Professor Dershowitz damages in an amount to be determined at trial, but in any event, no less than $20,000,000, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

   (iv) on the fourth cause of action, for fraudulent inducement, a judgment against the Defendants awarding to Professor Dershowitz damages in an amount to be determined at trial, but in any event, no less than $20,000,000, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

   (v) such other and further relief as the Court deems just, equitable and proper.

## <u>JURY DEMAND</u>

Professor Dershowitz demands a trial by jury of all issues presented herein that are triable by a jury.

**Dated:** **New York, New York**
    **May 26, 2021**

         Respectfully submitted,

         **NESENOFF & MILTENBERG, LLP**
         363 Seventh Avenue, Fifth Floor
         New York, New York 10001
         (212) 736-4500

         /s/ *Philip A. Byler*
         **PHILIP A. BYLER, ESQ. (seeking pro hac vice**
            **admission)**
         pbyler@nmllplaw.com

**BURSTYN LAW FIRM PLLC**
Sean A. Burstyn
Florida Bar No. 1028778
(admission to Southern District of Florida pending)
355 Lexington Avenue, Floor 8
New York, NY 10017
Phone No: (917) 810-8450
Sean.Burstyn@BurstynLaw.com

**JESSE DEAN-KLUGER, P.A.**

*/s/ Jesse Dean-Kluger*

Jesse Dean-Kluger
Florida Bar No. 62201
1550 Biscayne Boulevard, 2nd Floor
Miami, Florida 33132
Phone No. (305) 534-3460
Fax No. (786) 206-3075
jdk@jdkpa.com

**Attorneys for Plaintiff Alan Dershowitz**

## DEMAND FOR JURY TRIAL

Plaintiff Professor Dershowitz, through counsel listed above, hereby demands trial by jury.

39